UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH M. VAN SICKEL,<br><br>Petitioner,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>Respondent. | No. 1:18-cv-00107-LJO-GSA<br><br>**FINDINGS AND RECOMMENDATION THAT THE COURT ENTER JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |

## I.   <u>Introduction</u>

Plaintiff Kenneth M. Van Sickel ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument. *See* Docs. 16, 17 and 18. Having reviewed the record as a whole, the undersigned finds that the ALJ's decision is supported by substantial evidence and recommends that the Court deny Plaintiff's appeal.

## II.   <u>Procedural Background</u>

On October 10, 2013, Plaintiff filed an application for disability insurance benefits alleging disability beginning June 7, 2013. AR 29. The Commissioner denied the application initially on January 14, 2014, and upon reconsideration on August 5, 2014. AR 29. On

1

September 12, 2014, Plaintiff filed a timely request for a hearing before an Administrative Law Judge. AR 29.

Administrative Law Judge Brenton Rogozen presided over an administrative hearing on June 27, 2016. AR 47-76. Plaintiff appeared with the assistance of an attorney. AR 47. Impartial vocational expert Jose Chapparro (the "VE") also testified. AR 47.

On July 15, 2016, the ALJ denied Plaintiff's application. AR 29-41. The Appeals Council denied review on October 25, 2017. AR 6-9. In an undated order, the Appeals Council extended the time in which Plaintiff could commence a civil action in district court. AR 1. On January 22, 2018, Plaintiff filed a complaint in this Court. Doc. 1.

### III. Factual Background

#### A. Plaintiff's Testimony and Reports

Plaintiff (born October 18, 1961) lived with his wife and two adult children. AR 50. Although Plaintiff had a driver's license he no longer drove himself because of the sedating effect of his pain medications. AR 50, 234, 244. As a young man he attended college but took a job coaching football instead of finishing his degree. AR 65. When his wife became pregnant, Plaintiff gave up coaching for a heavy job in an ice cream factory that enabled him to make more money to support his family. AR 65-67.

Plaintiff last worked in a local high school as an instructional aide providing services to special needs students. AR 52. Tutoring students who were "laying back," Plaintiff provided one-on-one assistance with their assignments as well as individualized assistance, such as walking a disabled student to the bathroom. AR 52. The position required walking, standing, and stooping or bending over children working at their desks. AR 53. The school administration discouraged teachers from sitting down. AR 53. Plaintiff attempted to accommodate his pain and stiffness by alternating stooping, sitting, standing, and when possible, stretching in the back of the classroom where the students would not see him. AR 54-55. He sometimes used a chair with wheels as a substitute for standing or stooping next to a student. AR 55. Although his doctor prescribed pain medication, Plaintiff could not perform his job responsibilities if he took it. AR 56.

Shortly after the school year ended in 2013, school administrators terminated Plaintiff citing his medical issues and excessive absences.  AR 51-52.  Plaintiff did not think he could have continued to work in any event since his low back and neck pain prevented his stooping comfortably, and sitting to talk to students was not an option.  AR 53.  In addition, Plaintiff was always fatigued because restless leg syndrome kept him awake at night.  AR 53.  He had trouble concentrating.  AR 54.

In a pain questionnaire, Plaintiff reported dull pain all over and intense pain in his back and neck brought on by stress, overexertion or missed medication.  AR 242.  The pain began in 2004.  AR 243.  His medications included Nucynta, Norco, Flexeril, Lyrica, Requip and Xanax. AR 242.  The medication relieved his pain somewhat but caused drowsiness, constipation, irritability, mood swings, massive weight gain, irritable bowel syndrome, heart palpitations, and deteriorating eyesight.  AR 243.  Plaintiff also attempted to relieve pain by using a TENS unit, back brace, ice packs, walking, exercising, stretching and doing his physical therapy routine.  AR 243.

Now that Plaintiff had stopped working, he was able to sleep later in the morning to compensate for rest lost through poor sleep.  AR 58.  He was reluctant to commit to starting work at a set morning time because he did not function well after a night of poor sleep.  AR 58.

Plaintiff had recently developed back spasms, which complicated his ability to estimate his physical ability to do work.  AR 57.  He could walk about four blocks.  AR 57.  Although he could lift about 25 pounds, he was unable to carry the object without experiencing back spasms and pain.  AR 57.  Plaintiff struggled with carrying laundry, but thought that he could handle about 15 pounds.  AR 58.

On a typical day Plaintiff would awaken, have coffee, do the stretching exercises prescribed by his physical therapist, watch television and do some chores.  AR 59.  He was able to bathe and dress himself without assistance.  AR 59.  Although Plaintiff could dust and "vacuum a little bit," he avoided strenuous house and yard work that required stooping.  AR 59-60.  He did laundry.  AR 59.  He mowed the lawn although it was "pretty taxing" and hurt his neck and back.  AR 60.  He sometimes walked a block or two with the dog.  AR 60.

1  Plaintiff occasionally went out to eat but had no hobbies. AR 60-61. As a former high

2  school and college football coach, he enjoyed sports but could no longer go to the games. AR 61.

3  He no longer went to church because he could not sit in the pew. AR 61.

4  In a third-party adult function report Plaintiff's wife stated that he frequently did not

5  attend events in which he would have previously participated knowing that he would be in pain

6  afterward. AR 236. She had noticed impairment of his short-term memory. AR 236.

### B.    Medical Records[1]

8  On April 28, 2009, Plaintiff was treated in the emergency department of Tulare Regional

9  Medical Center for myocardial infarction. AR 316-44, 365-92, 453. Doctors, including

10  Plaintiff's cardiologist Shashi Sharma, M.D., performed successful stent angioplasty of Plaintiff's

11  right coronary artery and circumflex. AR 321-22, 459-64. In May 2009, Dr. Sharma noted that

12  Plaintiff was doing well and was able to walk without problems. AR 453.

13  In October 2009, Plaintiff saw Dr. Sharma with complaints of intermittent chest pain. AR

14  452. Electrocardiogram results were normal. AR 452. Dr. Sharma prescribed Topamax for

15  headaches, directed Plaintiff to continue his current prescription medications and resume taking

16  lisinopril and recommended that Plaintiff's primary care physician, Robert Allen, M.D., taper

17  Plaintiff off Celebrex. AR 452.

18  The record includes progress notes made by Thomas Evans, M.D., from June 2013

19  through April 2016. AR 424-30, 490-514. Dr. Evans diagnosed lumbar disc disease,

20  fibromyalgia, coronary disease and sleep apnea. AR 424, 426, 428.

21  On June 14, 2013, Johanna Hofer, PT, conducted an initial physical therapy evaluation.

22  AR 345-52. Hofer noted that Plaintiff's back pain began following an injury during high school

23  football. AR 350. His pain continued, and he reinjured his back at work in 2005. AR 350.

24  Plaintiff had also been diagnosed with fibromyalgia. AR 350. Hofer diagnosed chronic low back

25  ///

26  ---

[1]  The agency was unable to secure records of Plaintiff's treatment by Sanjiv Kaul, M.D. AR 396. On December 6,
27  2013, Kaweah Delta Rehabilitation Hospital advised the agency that Dr. Kaul had stopped working for the hospital at
the end of September 2013 and had not established another practice. AR 396. Dr. Kaul is no longer a licensed
physician in California. Search.dca.ca.gov/details/8002/A/35813/bf3e59fd2397900c01ef5c5f52d7172d (accessed
28  April 10, 2019).

4

pain with lumbar hypomobility.  AR 350.  She instructed Plaintiff in stage I lumbar/core strengthening exercises and the use of a TENS unit.  AR 346.

On August 2, 2013, rheumatologist Dan Watrous, M.D., performed a consultation at Dr. Evans' request.  AR 359-61.  Dr. Watrous observed Plaintiff to be a generally normal middle-aged man in no apparent distress.  AR 360.  Except for mild crepitus in the knees, the examination revealed no deformities in Plaintiff's peripheral joints and a good range of motion.  AR 360.  Plaintiff had "mild diffuse tenderness suggestive of mild fibromyalgia" but no vasculitis, tendonitis or bursitis.  AR 360.  There was tenderness of the paracervical and paralumbar muscles but no spasms.  AR 361.  Reflexes were intact.  AR 361.  The sacroiliac joints were not tender to palpation or stress testing.  AR 362.  Dr. Watrous diagnosed "[d]egenerative disc disease and osteoarthritis with secondary fibromyalgia and possible sleep apnea."  AR 362. The doctor recommended that Plaintiff undergo a sleep study.  AR 359, 361. He also recommended that Plaintiff rest frequently, particularly when his neck aggravated arm and leg pain, and occasionally use narcotics for pain.  AR 361.

In September 2013, Dr. Evans noted that Dr. Kaul and Dr. Watrous had diagnosed severe lumbar and cervical disc disease and osteoarthritis.  AR 509.  In July 2014, Dr. Evans noted that Plaintiff needed a pain management specialist.  AR 507.

Physical and medical rehabilitation specialist Jamil Ahmed, M.D., treated Plaintiff for shoulder and back pain and muscle spasms from October 2013 to December 2014.  AR 599-624. Dr. Ahmed initially diagnosed chronic pain syndrome; neck and back pain; muscle spasm; history of fibromyalgia; history of cervicalgia with cervical spondylosis; lumbar radiculopathy/radiculitis; right sacroiliitis; depression versus anxiety; insomnia; coronary artery disease, status post stenting; hyperlipidemia; and, restless lag syndrome.  AR 624.  He noted "[s]ome active trigger points present in different muscles with twitch response and referred pain upon palpation."  AR 618.    Plaintiff told Dr. Ahmed that he did not want spine surgery.  AR 623.  Dr. Ahmed prescribed multiple medications to relieve pain.  AR 605.

///

///

In November 2013, Dr. Sharma reported that Plaintiff's blood pressure was uncontrolled. AR 451. He prescribed HCTZ Benicar. AR 451. Dr. Sharma reported that Plaintiff complained of shortness of breath on exertion. AR 450.

In December 2013, Plaintiff underwent a sleep study at Good Night Sleep Center, Visalia, California. AR 409. Sleep specialist Christopher A. Mann, Ph.D., diagnosed obstructive sleep apnea. AR 409. Dr. Mann titrated optimal pressure for the CPAP mask and noted that Plaintiff might require sedation to acclimate to CPAP therapy. AR 409.

When Plaintiff saw Dr. Sharma in August 2014, he complained of daily shortness of breath and chest pain on exertion. AR 595. Dr. Sharma attributed Plaintiff's pain to angina and prescribed medications for coronary artery disease, high blood pressure, hyperlipidemia and chest pain. AR 596.

In September 2014, Plaintiff developed left knee pain while coaching football drill. AR 505, 551. Magnetic resonance imaging revealed a meniscal tear. AR 513. In December 2014, David G. Surdyka, M.D., surgically repaired the meniscal tear and removed a loose body from the knee. AR 551-61. At about the same time, Dr. Evans noted that Plaintiff's pain control program was not yet working well. AR 503.

In March 2015, Dr. Evans noted that Plaintiff had not developed a relationship with his pain management doctor. AR 501. In May 2015, the doctor noted that because of continuing problems with neck and shoulder pain, Plaintiff had arranged to see a new pain management specialist. AR 499. In June 2015, Dr. Evans noted that Plaintiff's prescriptions (Flexeril and Tizanidine) had not relieved his muscle spasms. AR 497.

Magnetic resonance imaging of Plaintiff's cervical spine in June 2015 revealed spondylosis, but no change since earlier imaging in September 2012. AR 514. (A copy of the image appears at AR 571.) Radiologist Jaime C. Aguet, M.D., wrote:

> Again noted is cervical spondylosis characterized by disc degeneration, disc bulging, marginal osteophyte hypertrophy, and uncinate hypertrophy. The central spinal canal is stenotic at the c3-4, and C5-6 levels. The AP diameter of the canal at the C3-4 level is 9mm. It is just under 10 mm at the c5-6 level. Central canal diameter exceeds 10 mm at all other cervical levels. The cervical cord demonstrates normal morphology and signal intensity at all cervical

levels. There is CSF in front of and behind the cervical [*sic*] at all other cervical levels. CSF pulsation artifact alters the cord signal on some of the sequences of this examination, but no melomalacia is suspected once artifacts are taken into account. The thoracic spinal canal demonstrates no evidence of significant spondylosis or of spinal canal stenosis, Facet hypertrophy is noted in the mid cervical spine. No significant neural foraminal stenoses.

AR 514.

Radiologist Michael Shin, M.D., reviewed imaging of Plaintiff's lumbar spine performed in June 2015. AR 516. Dr. Shin diagnosed degenerative disc disease at L4-5 and L5-S1, right paracentral disc protrusion at l4-5 resulting in lateral recess stenosis with compression/displacement of the right L5 nerve root. AR 516.

When Plaintiff saw Brandon Sorensen, M.D., at Pacific Spine and Pain Center in August 2015, he complained of severe lower back pain that was not relieved by prior treatment by other pain doctors. AR 632-35. Plaintiff told Dr. Sorensen that his prior pain specialists freely prescribed medications. AR 632. Dr. Sorensen and Plaintiff agreed to try a lumbar epidural spinal injection, which Dr. Sorensen administered in September 2015. AR 635-37. Plaintiff initially reported pain relief following the injection. AR 636. The following month, Plaintiff reported that the relief lasted for several days until Plaintiff overexerted himself. AR 638. In October 2015, Dr. Sorensen administered a cervical epidural spinal injection. AR 642.

When Dr. Evans' colleague, Bryan Paul Cruz, M.D., saw Plaintiff in January 2016, Plaintiff continued to complain of chronic pain and anxiety. AR 492.

Plaintiff received chiropractic treatment from Dr. Medonca. AR 562-66, 627.

### IV. Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability

status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are

medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI.   Summary of the ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity after the alleged onset date of June 7, 2013. AR 31. His severe impairments included obesity and degenerative disc disease of the lumbar and cervical spine. AR 31. Neither of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526). AR 35.

The ALJ concluded that Plaintiff had the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b). AR 35. Plaintiff was able to perform his past relevant work as a teacher aide I and freezer operator. AR 41. Accordingly, the ALJ found that Plaintiff was not disabled from June 7, 2013, through July 15, 2016, the date of the hearing decision. AR 41.

## VII.   Substantial Evidence Supported the Determination of Plaintiff's Residual Functional Capacity

Plaintiff alleges a single basis for reversal of the agency's denial of benefits: that substantial evidence did not support the ALJ's determination of Plaintiff's residual functional capacity. He offers multiple reasons for the Court to conclude that the ALJ erred in determining Plaintiff's residual functional capacity.

### A.   Determining Residual Functional Capacity

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The residual functional capacity assessment considers only functional limitations and

///

restrictions which result from an individual's medically determinable impairment or combination of impairments.  SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so the ALJ must determine credibility and resolve evidentiary ambiguities and conflicts in medical testimony.  *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883.  *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

**B.     Plaintiff's Subjective Symptom Testimony**

Plaintiff contends that the ALJ improperly discredited Plaintiff's subjective complaints at step four despite objective evidence of an underlying medical impairment.  Doc. 16-1 at 18-20. The Commissioner counters that the ALJ properly concluded that Plaintiff's subjective complaints were not fully reliable because Plaintiff's complaints were inconsistent over time and not fully supported by objective medical evidence.

///

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews*, 53 F.3d at 1039. Findings of fact must be supported by specific, cogent reasons. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). To determine whether the ALJ's findings are supported by substantial evidence, a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it. *Magallanes*, 881 F.2d at 750.

A claimant's statement of pain or other symptoms is not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p, 2017 WL 5180304 (Oct. 25, 2017). "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). The reliability of a social security claimant's subjective symptom testimony is a determination that permeates the disability analysis as a whole. Although a claimant's credibility is specifically identified as a component of the residual functional capacity analysis, credibility is also relevant in the ALJ's analysis at other steps of the disability analysis. In this case, the ALJ considered Plaintiff's subjective allegations of pain to be a material factor at steps two and four.

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281-1282. In this case, the first step is satisfied by the ALJ's finding that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR 36. The ALJ did not find Plaintiff to be malingering.

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his symptoms only if he makes specific findings that include clear and convincing reasons for doing so. *Garrison*, 759 F.3d at 1014-15; *Smolen*, 80 F.3d at 1281. "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (1995). *See also* Social Security Ruling ("SSR") 16-3p at *11 (stating that an ALJ's decision "focus on whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities"). It is not sufficient for the ALJ to make general findings; he must state which testimony is not credible and what evidence in the record leads to that conclusion. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell v. Sullivan*, 947 F.2d 341, 345-346 (9th Cir. 1991).

At step two,[2] the ALJ determined that Plaintiff's fibromyalgia, coronary artery disease, obstructive sleep apnea, knee injury with subsequent meniscal repair surgery, sinus infections, irritable bowel syndrome, depression and anxiety were not severe impairments. AR 31-35. For each of these alleged impairments the ALJ concluded that medical evidence did not support a finding that the impairment was severe.

At step four, the ALJ analyzed in greater detail the incongruity of Plaintiff's testimony and the underlying objective medical evidence. AR 36-39. Using Defendant's boilerplate language, the ALJ wrote that Plaintiff's "statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible for the reasons explained in this decision." AR 36.

The ALJ's analysis relied primarily on the medical evidence included in the administrative record. The ALJ found that although the medical records supported some of

---

[2] Plaintiff does not allege error in the ALJ's step two analysis.

Plaintiff's allegations, other claims were not consistently supported by the record. In this regard, the ALJ noted the following: Dr. Watrous's examination found tenderness in the paracervical and paralumbar muscles but also a good range of motion, intact reflexes, no spasms and to tenderness in the sacroiliac joints. AR 37. Dr. Ahmed's treatment notes indicated cervical and lumbar back pain with tight and tender back and neck muscles but no shoulder tenderness. AR 37. The straight-leg raising test and Faber's sign were mildly positive on Plaintiff's right side, but Dr. Ahmed reported that Plaintiff had intact sensation, normal strength and gait, and could stand and walk unassisted. AR 37-38. Similarly, although Plaintiff reported pain radiating to his legs and numbness and tingling in his arms, Dr. Sorensen's physical examinations did not support those claims, but indicated normal motor strength and a full range of neck motion. AR 38. Dr. Sharma's treatment notes did not support Plaintiff's claims of debilitating back and neck pain and inability to complete a stress test without physical support. AR 38-39. Similarly, Dr. Evans found no acute distress, normal motor strength, and a full range of neck motion. AR 39. Despite Plaintiff's claims of irresistible drowsiness, the treatment notes do not indicate that Plaintiff ever complained to his doctors of drowsiness. AR 39. And despite allegations of constant, intractable pain, Plaintiff continued working for nine years, leaving only when his teaching aide contract was not renewed. AR 39. Moreover, Plaintiff continued coaching football after he stopped working as a teacher's aide. AR 551.

Plaintiff emphasizes that because a "claimant's subjective statements may tell of greater limitations than can medical evidence alone," an "ALJ may not reject the claimant's statements regarding her limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147-48 (2001) (quoting *Fair*, 885 F.2d at 602 (9th Cir. 1989)). "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of

disability." *Bunnell*, 947 F.2d at 345 (internal quotation marks and citations omitted). But this does not mean that an ALJ cannot find a claimant lacks credibility when his subjective symptom testimony lacks support from objective medical evidence. If an adjudicator concludes that a claimant's allegations of severity are not credible, he must make findings to support that conclusion that are "sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrary discredit a claimant's testimony." *Id.* (internal quotation marks and citations omitted).

As indicated above, the ALJ provided clear and convincing reasons for concluding that Plaintiff lacked credibility, all of which were based in the record as a whole. The standard of review limits a district court's discretion on challenges to the ALJ's adverse credibility determinations. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson*, 402 U.S. at 401. If the evidence could reasonably support either outcome, a court may not substitute its judgment for that of the ALJ. *Flaten v. Sec'y, Health and Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). In other words, although Plaintiff urges that the ALJ should not have relied on medical reports indicating an absence of abnormal findings in examination or testing of Plaintiff (AR 19), this Court may not overrule the ALJ's weighing of the evidence for an alternative interpretation favored by the claimant.

Further, in assessing the claimant's credibility, the ALJ may use "ordinary techniques of credibility evaluation," considering factors such a lack of cooperation during consultative examinations, a tendency to exaggerate, inconsistent statements, an unexplained failure to seek treatment, inconsistencies between the testimony and conduct; and inconsistencies between daily

14

activities and the alleged symptoms.  *Tonapetyan,* 242 F.3d at 6; *see also Smolen*, 80 F.3d at 1284; *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (including as factors claimant's reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, work record, and testimony from physicians and third parties about the nature, severity, and effect of the alleged disabling symptoms).  Here, the ALJ did not err in considering such factors as Plaintiff's failure to complain to his doctors of continual drowsiness to which he later testified, or the complete absence of medical evidence to support Plaintiff's claim that irritable bowel syndrome rendered him unable to remain comfortably in the classroom for a complete class period, or objective medical reports indicating that commonly known anxiety and anti-depressive medications sufficiently controlled Plaintiff's symptoms.

"If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F.3d at 958.  On the other hand, if the ALJ's credibility finding is supported by substantial evidence in the record, courts "may not engage in second-guessing." *Id.* at 959.  Because the ALJ supported his determination with substantial evidence in the record, the Court cannot second guess the ALJ's assessment that Plaintiff's subjective complaints lacked credibility.

**C.     The ALJ Properly Relied on Existing Medical Evidence to Determine Plaintiff's Residual Functional Capacity**

Plaintiff contends that substantial evidence did not support the ALJ's determination of Plaintiff's residual functional capacity.  He alleges that the ALJ misrepresented the record and erred in the weights that he assigned to the medical experts who offered opinions.  The Commissioner disagrees with Plaintiff's characterization of the hearing decision contending that the ALJ's determination was supported by substantial evidence in the record.

1.     **An ALJ's Reliance on Medical Opinion, In General**

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in disability determinations. *Lester*, 81 F.3d at 830. Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen*, 80 F.3d at 1285. The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

The opinion of a non-examining physician may constitute substantial evidence when it is "consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957. Such independent reasons may include laboratory test results or contrary reports from examining physicians and Plaintiff's testimony when it conflicts with the treating physician's opinion. *Lester*, 81 F.3d at 831 (citing *Magallanes*, 881 F.2d at 755).

2.     **Medical Opinions**

a.     **Agency Physicians**

At the initial review, C. Bullard, M.D., opined that Plaintiff was able to lift twenty pounds occasionally and 10 pounds frequently and sit, stand or walk six hours in an eight-hour work day. AR 84. He might need to alternate positions due to pain. AR 84. Plaintiff could occasionally

climb ramps, stairs, ladders, ropes and scaffolds; stoop; kneel; crouch; and crawl.  AR 85.  Dr. Bullard considered the opinion of Plaintiff's treating physician, Thomas R. Evans, M.D., to be overly restrictive and unsupported by Plaintiff's activities of daily living.  AR 86.  Accordingly, the agency determined that Plaintiff was not disabled.  AR 87.  On reconsideration, I. Ocrant, M.D., agreed with the initial assessment of residual functional capacity.  AR 101-02.

### b. <u>Treating Physician</u>

Dr. Evans completed an undated medical source statement, which was faxed to the agency on December 19, 2013.  AR 400-02.  Dr. Evans opined that Plaintiff could lift twenty pounds occasionally and less than ten pounds frequently.  AR 400.  Because of his cervical and lumbar pain, Plaintiff could sit for four to six hours in an eight-hour workday.  AR 401.  Dr. Evans did not indicate the length of time Plaintiff was able to stand in an eight-hour work day.  AR 401. Plaintiff needed to change position after standing for fifteen minutes or sitting for twenty minutes. AR 401.  He could occasionally balance or stoop but could never climb, kneel, crouch, crawl or reach above his head.  AR 401.  Environmental limitations included heights, moving machinery, temperature extremes, chemicals and dust.  AR 401.

### 3. <u>Hearing Decision</u>

The ALJ determined that Plaintiff had the residual functional capacity to perform the full range of light work.  After finding that Plaintiff's subjective complaints were neither internally consistent nor fully consistent with the objective medical evidence in the administrative record (*see* credibility analysis above), the ALJ analyzed in detail Plaintiff's testimony and the medical opinions.  The ALJ observed that Plaintiff's own testimony that he could lift 25 or 15 pounds was generally consistent with a finding that Plaintiff could perform light work.  AR 40.

The ALJ gave limited weight to the opinions of the agency physicians.  AR 40.  He observed that although the agency physicians' opinions on exertional limitations were consistent with the medical records that were available to them, their opinions concerning non-exertional limitations did not consider later physical examinations by Drs. Evans, Dodson and Sharma reporting normal results.  AR 40.

///

The ALJ gave little weight to the opinions of Dr. Evans and Dr. Ahmed.  AR 40.
Although Dr. Evans opined in his undated statement that Plaintiff was capable of light work with
multiple non-exertional limitations, his report did not explain the bases of his conclusions or
provide a narrative of objective medical evidence or treatment records.  AR 40.  As a result, the
ALJ was unable to evaluate the opinion's validity.  AR 40.  Further, Dr. Evans' December 2013
conclusion that Plaintiff's cervical and lumbar disc disease markedly limited Plaintiff's activity
levels was inconsistent with Dr. Evan's findings elsewhere that Plaintiff retained a full range of
motion of his neck, and normal strength in his upper and lower extremities.  AR 40.

The ALJ discounted Dr. Ahmed's treatment notes which were remarkably similar for the
various appointments.  AR 40.  Because the reports, including Dr. Ahmed's objective findings,
did not meaningfully vary from visit to visit, the ALJ declined to give more than a little weight to
the written records.[3]  AR 40.

## D.    The ALJ Did Not Improperly Rely on His Own Opinion

Plaintiff also accuses the ALJ of improperly relying on his own lay interpretation of
objective medical evidence.  Doc. 16-1 at 8.

Plaintiff is correct that "an ALJ may not act as his own medical expert as he is "simply not
qualified to interpret raw medical data in functional terms."  *Nguyen v. Chater*, 172 F.3d 31, 35
(1st Cir. 1999).  Decisions addressing this issue frequently speak of an ALJ's "play[ing] doctor
and making [his] own independent medical findings." *See, e.g., Banks v. Barnhart*, 434 F.Supp.2d
800, 805 (C.D. Cal. 2006).  Such cases encompass multiple factual scenarios.  *See, e.g. Nguyen*,
172 F.3d at 35 (ALJ formulated claimant's residual functional capacity based on magnetic
resonance images without the benefit of any medical opinion about the functional limitations
attributable to the impairments depicted in the images); *Rohan v. Chater*, 98 F.3d 966, 970 (7th
Cir. 1996) (ALJ erred in rejecting medical opinion based on the ALJ's belief that claimant's

---

[3] Plaintiff's brief includes a lengthy argument that Dr. Ahmed's treatment notes consisted of no more boilerplate than other physicians' treatment notes.  Although Plaintiff correctly observes that all medical treatment notes consist of boilerplate components, the undersigned agrees with the ALJ's opinion that the language used in each of Dr. Ahmed's records is so extensively similar as to limit the notes' value for analyzing Plaintiff's residual functional capacity.

attempts to operate a small business were inconsistent with a diagnosis of major depression); *Manso-Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) (ALJ's common sense determination of residual functional capacity was not supported by substantial evidence where the largely illegible record revealed little physical impairment and included no functional analysis by a treating or expert physician); *Day v. Weinberger*, 522 F.2d 1154, 1155-56 (9th Cir. 1975) (ALJ rejected opinions of treating physicians in favor of criteria set forth in a leading medical textbook identified by the ALJ in his independent medical research).

Although these cases set forth multiple factual situations in which an ALJ determined a claimant's residual functional capacity based on her own medical evaluation, none of them apply to the ALJ's determination of Plaintiff's residual functional capacity based on evidence in the administrative record. The ALJ here properly relied on the exertional limitations addressed by the agency physicians and did not go outside the record. *See Banks*, 434 F.Supp.2d at 805 (ALJ properly relied on physician's opinion of Plaintiff's residual functional capacity).

**E.    The Record Supported a Finding of "Normal" Examinations**

Plaintiff contends that the ALJ's reliance on "normal physical examinations" reported by Drs. Evans, Dodson and Sharma constituted a misrepresentation of the record as a whole. Doc. 16-1 at 12. Although the undersigned acknowledges Plaintiff's interest in emphasizing other language addressing his impairments, characterizing the ALJ's findings as misrepresentation would be inaccurate.

The hearing decision includes numerous references to instances in which Plaintiff's physicians recorded examples of Plaintiff's functioning normally. AR 37-39. The record supports the ALJ's assessment, including 15 instances in which a physician describes Plaintiff as appearing in no acute distress; 14 times that Plaintiff demonstrated a full range of motion of his neck; 17 times that Plaintiff exhibited a supple neck; 15 instances in which Plaintiff's extremities were described as normal; 15 times Plaintiff exhibited normal motor strength; five examinations noting a normal cervical spine; five occasions on which Plaintiff exhibited no evidence of back pain; 12 times that Plaintiff denied painful joints; 12 times Plaintiff denied weakness; and, five

times Plaintiff denied lower back pain. *See citations to record in* Doc. 17 at 5-6. In short, the ALJ's determination was well supported by the record.

### F. Failure to Consider Dr. Watrous' Examination

Plaintiff contends that the ALJ's residual functional capacity analysis improperly omitted consideration of Dr. Watrous' recommendation that Plaintiff rest frequently and lie down ten to twenty times daily "if his neck is aggravating more pains in his arms and legs" (AR361). Doc. 16-1 at 17. The Commissioner responds that the ALJ was not required to treat Dr. Watrous' statement as a medical opinion.

Dr. Watrous, a rheumatologist, saw Plaintiff once for a rheumatological consultation requested by Dr. Evans to evaluate Plaintiff for degenerative arthritis and secondary fibromyalgia. AR 359. In the course of the examination, Dr. Watrous observed that Plaintiff's "[g]eneral appearance [wa]s of a middle-aged male in no apparent distress" and that Plaintiff had "mild diffuse tenderness suggestive of mild fibromyalgia." AR 360. In the "plan" section of his letter, Dr. Watrous wrote:

> I have recommended that he rest frequently and he may have to lie down 10-20 times a day if his neck is aggravating more pains in his arms and legs. However, hopefully he can just control most of the pain by resting frequently and occasional use of narcotics. We discussed fibromyalgia treatment. I would recommend evaluation for sleep apnea.
>
> Since he is already on appropriate medical care for his problems, I have recommended that he return on an as-needed basis after discussing these issues with you.

AR 361.

Dr. Watrous' statement was not a medical opinion for purposes of a social security disability analysis. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s), and whether you have one or more impairment-related limitations or restrictions in your ability to perform (1) the physical or mental demands of work, (2) other demands of work (such as seeing or hearing), and (3) adapt to environmental conditions of work. 20 C.F.R. § 404.1513(a)(2). Dr. Watrous' plan was offered in response to Dr. Evans' request for a consultation, that is, "a deliberation by two or more physicians with respect to a

diagnosis or treatment in any particular case." *Dorland's Illustrated Medical Dictionary* at 372 (W.B. Sanders Co. 1994). Nothing in the record indicates that Dr. Watrous played any further role in Plaintiff's diagnosis and treatment.

The ALJ acknowledged Dr. Watrous' consultation and considered the reported results of his examination of Plaintiff. AR 37. Nothing further was required.

### G. ALJ's Failure to Consider Fully the Psychiatric Opinions

Finally, Plaintiff contends that the Court should reject the residual functional capacity analysis because the ALJ discounted Dr. Marselle's consultative opinion and gave limited weight to the agency physicians' psychological opinions. However, Plaintiff does not challenge the ALJ's finding at step two that Plaintiff's anxiety and depression were adequately managed by medication and were not severe impairments.

### 1. Mental Health Opinions

### a. Dr. Marselle's Opinion

In July 2014, psychologist Robert A. Marselle, Psy.D, R.N., evaluated Plaintiff at the agency's request. AR 480-88. Testing indicated that Plaintiff was of low average intelligence and had deficient working memory. AR 485-86. Although Plaintiff had no errors on the Trail Making tests, his processing speed was reduced, perhaps because of ongoing treatment with a narcotic patch. AR 487. Dr. Marselle wrote:

> The claimant's depression does create problems for him. His feelings of hopelessness and helplessness are intense. He has been out of work for some time. The panic attacks are the more intense of the Axis I diagnoses where Plaintiff relates that he becomes completely immobilized. He does have social phobia. The panic attacks mostly occur in social situations and he relates that he has always been slightly social phobic and it has gotten much worse. He is on a narcotic patch for chronic, debilitating pain.

AR 487.

Dr. Marselle opined that Plaintiff's prognosis was good. AR 487. Plaintiff had no impairment in his ability to understand, remember and carry out simple one- or two-step job instructions, and to accept instructions from supervisors. AR 487-88. He had mild impairment in his ability to do detailed and complex instructions and to perform work activities without special

or additional supervision. AR 487-88. Plaintiff's ability to maintain concentration, attention, persistence and pace was moderately impaired due to dysphoria and pain. AR 488. His ability to maintain regular attendance and to perform work activities on a consistent basis was also moderately impaired. AR 488. Because of Plaintiff's high anxiety and panic attacks, his ability to relate and interact with co-workers and the public, and to associate with day-to-day work activity, including attendance and safety, were markedly impaired. AR 488.

### b. Agency Psychological Experts

On January 7, 2014, as part of the agency's initial review, agency physician E. Aquino-Caro, M.D., noted that Plaintiff did not allege a mental condition. AR 82. Plaintiff took Xanax for anxiety but was receiving no other mental health treatment. AR 82. Although Plaintiff complained of some difficulty completing tasks and impaired concentration, he attributed these impairments to side effects of his pain medications. AR 82. Plaintiff was able to perform his activities of daily living and was able to do "a lot of activities," including helping his children with homework, conducting internet research, and reading. AR 82. Dr. Aquino-Caro opined that Plaintiff had no severe mental impairment. AR 82.

On August 5, 2014, agency physician N. Haroun, M.D., reviewed the psychological record and Dr. Marselle's consultative opinion on reconsideration. AR 98. Dr. Haroun wrote:

> There is little evidence to support presence of major depression diagnosed at the [consultative examination]. The objective exam at the [consultative examination] shows a "dysphoric" mood and no impairment in ability to provide history, attend and concentrate on the tests and no social or [activities of daily living] deficits. Claimant sees his [primary care physician] regularly. The [primary care physician] may have prescribed a benzodiazepine to this claimant, but this alone does not suggest presence of an anxiety disorder. Claimant has never been referred to a mental health provider. He has never been in any specific mental health treatment. He has never been hospitalized for mental health problems. The [consultative examination] shows [mental status examination within normal limits] and a GAF of 70/100. Claimant may have some mood symptoms associated with his general medical condition but there is no evidence to support presence of any severe mental [major depressive impairment].

AR 98.[4]

---

[4] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n. 2 (9th Cir).

## 2. **Non-Severe Mental Impairment**

A mental impairment is not severe if it does not significantly limit the claimant's ability to perform basic work activities, such as understanding, carrying out, and remembering simple instructions; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. 404.1522. At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987); 20 C.F.R. §416.920(a)(4)(ii). An impairment is a medically determinable physical or mental impairment or combination of physical or mental impairments. 20 C.F.R. § 416.902(f). If a claimant does not have an impairment or combination of impairments which significantly limit the claimant's physical or mental ability to do basic work activities, the Commissioner will find that the claimant does not have a severe impairment. 20 C.F.R. § 416.920(c).

"The step-two inquiry is a de minimus screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290. "It is not meant to identify the impairments that should be taken into account when determining the RFC." *Buck v. Berryhill*, 869 F.3d 1040, 1048-49 (9th Cir. 2017). An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual['s] ability to work." *Smolen*, 80 F.3d at 1290; SSR 85-28. "[T]he severity regulation is to do no 'more than allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working.'" SSR 85-28 (quoting *Baeder v. Heckler*, No. 84-5663 (3d Cir. July 24, 1985)).

Even if an individual impairment is not sufficiently serious to prevent a person from working, an ALJ must consider the combined effect of all of the claimant's impairments on his/her ability to function as well as considering the claimant's subjective symptoms, such as pain

---

A GAF score from 61-70 indicates: Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* at 34 (4th ed. 2000)

or fatigue. *Smolen*, 80 F.3d at 1290. "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." SSR 85-28. The ruling warned:

> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's abilities to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued. In such a circumstance, if the impairment does not meet or equal the severity level of the relevant medical listing, sequential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience.

SSR 85-28.

For example, in the *Smolen* case, Ms. Smolen suffered from childhood cancer that resulted in the loss of one kidney, loss of part of her left lung, changes in her remaining lung tissue, mild anemia, suppression of bone marrow production, and spinal scoliosis, all of which led to severe fatigue and back pain. *Smolen*, 80 F.3d at 1290. The ALJ found only a single severe impairment, "slight scoliosis," which limited her ability to walk and sit. *Id.* The step two analysis disregarded Ms. Smolen's subjective symptoms when determining severity. *Id.* The Ninth Circuit rejected the step two analysis: "Having found Smolen to suffer from only one "severe" impairment at step two, the ALJ necessarily failed to consider at step five how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to do work." *Id.* at 1291.

"In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Buck*, 869 F.3d at 1049 (quoting *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p) (internal quotations omitted). As a result, a claimant's residual functional capacity should be the same whether or not certain impairments are considered severe. *Buck*, 869 F.3d at 1049. Under applicable law, the ALJ in this case erred in failing to consider Plaintiff's alleged mental impairments in the course of the residual functional capacity analysis. Unlike Ms. Smolen's case, however, the ALJ's omission here is appropriately considered to be harmless.

24

1    In concluding at step two that Plaintiff's depression and anxiety were non-severe
2  impairments, the ALJ relied on the opinions of the state agency psychologists.  AR 33-34.  The
3  ALJ also adopted the agency consultants' rejection of Dr. Marselle's opinion as inconsistent with
4  Plaintiff's medical records and activities of daily living.  AR 34.  Having concluded at step two
5  that Plaintiff's mental impairments were fully controlled by medication prescribed by his primary
6  care physician, and that Plaintiff had never sought any further treatment, the ALJ had already
7  determined that Plaintiff's mental impairments had no effect on his ability to do work.  No
8  evidence of Plaintiff's mental impairment within the record would reasonably have resulted in a
9  different conclusion at step four.

### H.    Summary

11    Contrary to Plaintiff's contentions, analysis of the evidence as a whole and applicable law
12  support the ALJ's determination of Plaintiff's residual functional capacity.

### IX.    Conclusion and Recommendation

14    Based on the foregoing, the undersigned recommends that the Court find that the ALJ's
15  decision was based on proper legal standards and supported by substantial evidence in the record
16  as a whole.  Accordingly, it is recommended that the Court affirm the Commissioner's
17  determination denying Plaintiff disability insurance benefits pursuant to Title II of the Social
18  Security Act.

19    These Findings and Recommendations are submitted to the district judge assigned to this
20  action, pursuant to Title 28 of the United States Code § 636(b)(1)(B). Within **fourteen (14)** days
21  of service of this recommendation, Plaintiff may file written objections to these findings and
22  recommendations with the Court.  Such a document should be captioned "Objections to
23  Magistrate Judge's Findings and Recommendations."  The district judge will review the
24  magistrate judge's Findings and Recommendations pursuant to Title 28 of the United States Code
25  section 636(b)(1)(C).  Plaintiff is advised that failure to file objections within the specified time
26  ///
27  ///
28  ///

may waive the right to appeal the district judge's order. *Wilkerson v. Wheeler*, 772 F. 3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F. 2d 1391, 1394 (9th Cir. 1991); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  __**May 28, 2019**__            _____**/s/ Gary S. Austin**_____
                                        UNITED STATES MAGISTRATE JUDGE